ACCEPTED
01-14-00537-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
4/30/2015 11:34:35 AM
CHRISTOPHER PRINE
CLERK

## NO. 01-14-00537-CV

## IN THE 1st COURT OF APPEALS

## HOUSTON, TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
4/30/2015 11:34:35 AM
CHRISTOPHER A. PRINE
Clerk

## FRANCIE WILLIS
## Appellant

## vs.

## BPMT, LLC
## Appellee

On appeal from the 164TH Judicial District, Harris County, Texas
Trial Court Cause No. 2009-08290

## BPMT, LLC'S
## RESPONSE TO APPELLANT'S MOTION UNDER TEXAS RULE OF APPELLATE PROCEDURE 24.4 CHALLENGING THE TRIAL COURT'S MARCH 30, 2015 ORDER CONCERNING THE APPELLANT'S NET WORTH AFFIDAVITS

TANYA N. GARRISON
State Bar No. 24027180
JONATHAN D. SAIKIN
State Bar No. 24041847
WEYCER, KAPLAN, PULASKI & ZUBER, PC
11 Greenway Plaza, Suite 1400
Houston, Texas 77046-1104
Telephone: (713) 961-9045
Facsimile: (713) 961-5341

ATTORNEYS FOR APPELLEE

TO THE HONORABLE FIRST COURT OF APPEALS:

Appellant Francie Willis's 24.4 attempts to reduce the amount of her supersedeas bond should be denied because:

1. A decision on net worth is in the discretion of the trial court; and

2. The trial court did not abuse its discretion in finding that Ms. Willis's net worth was $197,565.20.

## I. Introduction

BPMT, LLC has a judgment against Ms. Willis for approximately $65,000 including pre-judgment interest. This number is growing every day by approximately $5.25 in post-judgment interest. *See Tab 3 to Appellant's Motion.* Ms. Willis, as is her right, appealed this judgment. However, BPMT has the right to seek enforcement of its judgment while this case is on appeal, unless Ms. Willis complies with Rule 24 of the Texas Rules of Appellate Procedure. Ms. Willis attempted to do that by filing a negative net-worth affidavit, claiming that her net worth was less than $0, and as such she was not required to post a bond.

Ms. Willis's claims are nothing more than her ongoing efforts to conceal assets and hinder her creditors. Ms. Willis lives in a condo in

River Oaks, Houston, Texas worth over $1,400,000. Ms. Willis enjoys a vacation home in Santa Fe, New Mexico worth over $1,600,000. Ms. Willis and her husband recently sold commercial property worth approximately $1,000,000. The two of them own oil and gas investments, promissory notes, and other business investments worth approximately $4,500,000. Ms. Willis drives a Lexus, spends money at high end retail establishments, and otherwise enjoys all the benefits of a privileged lifestyle (charity fundraisers, art collections, jewelry, and fur coats).

Her claim of a negative net-worth is the product of a Partition or Exchange Agreement (the "Agreement") she entered with her husband, Michael Willis, in 2011 that put all of the assets of any value owned by the community estate into Michael's name, while moving the major liabilities into Francie's name. The Agreement was entered just after Ms. Willis's business – Urban Retreat – got into some financial trouble with the IRS and other creditors, including BPMT. This was an obvious attempt to move assets away from her creditors.

BPMT challenged Willis's negative net-worth affidavit by making two arguments: (1) that the trial court should disregard the Agreement

under the Uniform Fraudulent Transfer Act; and (2) in the alternative, that Ms. Willis's net worth affidavit was insufficient because it did not reflect the value of her assets as identified in the Agreement.

The trial court was unwilling to set aside the Agreement under UFTA through this proceeding. However, after hearing evidence on both sides of this issue, determined that the value of Ms. Willis's assets was $1,160,454.24. Her liabilities totaled $962,889.04. As such, her total net worth was $197,565.20. The trial court disagreed with Ms. Willis that her life estates in the River Oaks Condo and the Santa Fe Vacation Home[1] were worth $0. The trial court, using its discretion, was of the opinion that these life estates had much more value, and thus the $5 bond Ms. Willis posted was insufficient.

## II. STANDARD OF REVIEW

In this Motion, Ms. Willis challenges the ruling of the trial court that her net worth is $197,565.20, which was made after an evidentiary hearing. The trial court has discretion to determine the debtor's net worth and order additional security to supersede a judgment. *See* TEX. R. APP. P. 24.2(C)(3) and 24.4(a)(5). The standard of review of the trial

---

[1] As a part of the Agreement, ownership of these two properties was transferred to Michael Willis, and Francie Willis was granted a life estate in both homes.

court's rulings concerning the amount and type of bond required is an abuse of discretion.   *EnviroPower, LLC v. Bear, Stearns & Co.,* 265 S.W.3d 1, 5-6 (Tex. App. – Houston [1st Dist.] 2008, pet. denied) . "The test for abuse of discretion is whether the trial court acted without reference to guiding rules and principles. We will reverse the trial court only if its ruling is arbitrary or unreasonable." *McConnell v. McConnell,* 2011 Tex. App. LEXIS 674 (Tex. App. – Houston [1st Dist.] 2011, no pet.).

### III.  THE RULES AND THE LAW SURROUNDING NET WORTH INQUIRIES

In 2003, through the adoption of House Bill 4, the Texas Supreme Court implemented changes to Texas Rule of Appellate Procedure 24. The new rule incorporated a cap on supersedeas amounts; however, if the cap did not apply, it allowed judgment debtors to base the amount of the supersedeas on one of two things: (1) the amount of the judgment; or (2) 50% of the debtor's net worth, whichever was less.  *See* TEX. R. APP. P. 24; *see also Reshuffling the Deck: Enforcing & Superseding Civil Judgments on Appeal After HB4,* ELAINE A. CARLSON, 46 S. TEX. L. REV. 1035 (Summer 2005).

The determination of net worth should be made using generally accepted accounting principles ("GAAP"), and according to the Houston 14th Court of Appeals:

> "Net worth" is a term used by laymen as well as professionals. Although it is a term of art in business and accounting, its meaning is the same in ordinary usage. Dictionaries define "net worth" as the amount by which resources exceed liabilities to creditors.
>
> . . .
>
> ***The plain meaning of "net worth," as used in section 52.006 of the Texas Civil Practice and Remedies Code and Rule 24, is the difference between total assets and total liabilities determined in accordance with GAAP.***

*Ramco Oil & Gas, Ltd. v. Anglo Dutch (Tenge) L.L.C.,* 171 S.W.3d 905 (Tex. App. – Houston 14th Dist. 2005, pet denied) (citations omitted).

This standard was adopted by this Court in *EnviroPower, LLC v. Bear, Stearns & Co.,* 265 S.W.3d 1, 5-6 (Tex. App. – Houston [1st Dist.] 2008, pet. denied). In *EnviroPower,* this Court specifically recognized that a valuation of assets is not dependent on a "fair market valuation" of the assets. This Court stated:

> The dissenting opinion on en banc order falls into the trap that the Legislature intended to preclude by amending section 52.006, as discussed in *Ramco.* In short, it would require the trial court to hold a hearing to determine the value of the judgment debtor's

assets upon their sale and to use the "fair market value" of those assets, thus determined, to set the supersedeas bond, thereby thwarting the purpose of the Legislature in amending section 52.006.

*Id.*

In order to establish net worth, the judgment debtor must file an affidavit of net worth that states in detail the assets and liabilities of the debtor. The judgment debtor's affidavit is *prima facie* evidence of the debtor's net worth, although it may be contested by the judgment creditor. *See LMC Complete Automotive, Inc. v. Burke,* 229 S.W.3d 469 (Tex. App. – Houston [1st Dist] 2007, pet. denied); *see also* TEX. R. APP. P. 24.2(c). Upon the filing of a motion to contest net worth, it is the judgment debtor's burden of proving net worth. *See* TEX. R. APP. P. 24.2(c)(3).

There is nothing in Rule 24 that requires the use of fair market value of the assets owned by a judgment debtor. And this Court's precedence in *EnviroPower,* indicates that it is misguided to require such a standard.

## IV. EVIDENCE ESTABLISHED A POSITIVE NET WORTH OF FRANCIE WILLIS

In connection with its Motion, BPMT took the depositions of Francie Willis and her husband Michael Willis. In addition to discovering the existence of the Agreement, certain admissions were telling. Most importantly was the discovery of the Willis Agreement, in which Mrs. Willis represented that her assets totaled $2,168,335.

### SCHEDULE "B"

#### PROPERTY Of FRANCIE A. WILLIS

| ITEM | VALUE |
|---|---|
| 1. Life Estate in Condo at 12 Eaton Square, Houston, TX 77027 (25 years) | $1,050,000 |
| 2. Life Estate in Home at 811 Los Lavatos, Santa Fe, NM (25 years) | 1,050,000 |
| 3. Sole Ownership of Francie Willis Enterprises, Inc. (Texas corporation) | 10,000 |
| 4. IRA Account with Raymond James | 1,825 |
| 5. Personal Jewelry, Clothes & Fur at cost | 18,900 |
| 6. Artwork in Houston & Santa Fe Homes ($35,390 cost = est. FMV) | 35,390 |
| 7. Checking Account at Compass Bank | 2,000 |
| 8. Savings Account at Compass Bank | 220 |
| TOTAL | $2,168,335 |

*See Exhibit D.*

She admitted that this valuation was done by an appraiser she hired.

8

Q    Who valued them?
A    I'm sure -- I don't know who valued them, but
appraisers, I assume.
Q    And you initialed this at the bottom, correct?
A    Yes.
Q    So you agreed with the value of those assets?
A    I did.

*See Exhibit C, p. 51.*

At the hearing on the sufficiency of Ms. Willis's bond, Michael Jayson, Ms. Willis's CPA, admitted that he was the one who put this valuation together, and that it was based on the value of the saved rental discounted by Ms. Willis's life expectancy. *See Tab 9, p. 23-24.*

On December 19, 2014, the trial court conducted an initial hearing on this matter and held that Ms. Willis's first affidavit of net worth was insufficient because it did not identify the life estates *at all.* Ms. Willis then filed a new declaration of net worth. In that declaration, she stated that her life estates have $0 in value. Attached to her declaration of negative net worth, Ms. Willis includes the affidavit of Mr. Jayson. He opined that the fair market value of the life estates is $0 because they are non-transferrable. As a result, he continues, there is no fair market value.

However, lack of fair market value does not mean lack of value. And, Mr. Jayson's suggestion to the contrary is false. Mr. Jayson's

9

exact testimony was:

> 4. Francie Willis's life estates are nontransferable and cannot be marketed. Pursuant to Generally Accepted Accounting Principles ("GAAP"), they have no marketable value.

*See Tab 8, Exhibit F.*

But, under GAAP, lack of marketability does not mean lack of value. In fact, life estates definitely have value because they are an interest that gives Ms. Willis the right to use, occupy, and even rent out the property and receive profit. More specifically, these life estates save Ms. Willis from the obligation of paying rent for the rest of her life. For the remainder of her life, she will never pay one penny for housing or vacation home use in New Mexico. Under GAAP, every property interest has value. Mr. Jayson agreed that Ms. Willis's life estates have "huge value." *See Tab 9, p. 22.*

> Q: She got significant value from these life estates, correct?
>
> A: Huge value.

*Id.*

What Mr. Jayson attempted to argue was that GAAP **requires** a fair market valuation. However, he was unable to cite to any provision or rule that made such a requirement. *See Tab 9, p. 28 and 36-37.* The best he could do was cite to a provision of GAAP on how to determine

fair market value, but nothing that said that fair market value is the only methodology of determining value. *Id.* In fact he testified:

> Q:   And F-A-S-B, FASB, has not put forward any standards on how to evaluate - - value a life estate, have they?
>
> A:   No.

*See Tab 9, p. 30.*[2]

In addition to hearing from Mr. Jayson, the trial court heard evidence from Vahid Shariatzadeh. Mr. Shariatzadeh is also a CPA and certified financial planner. His testimony was presented without objection from Ms. Willis. Mr. Shariatzadeh went on to explain that the rules of GAAP are promulgated by FASB – Financial Accounting Standards Board. Mr. Jayson agreed with this statement. *See Tab 9, p. 29.*

Sometimes, the GAAP are silent on how to address specific situations. In such a case, a CPA can call FASB for guidance. And that is what Mr. Shariatzadeh did in this case. In this case, because GAAP is silent on the issue of the valuation of life estates, Mr. Shariatzadeh sent a formal request to FASB, and contacted AICAPA (American

---

[2] As explained herein, FASB is the organization that promulgates the GAAP.

Institute of Certified Public Accountants)[3], and was told there are two methods of determining value of a life estate under GAAP: (1) use of Section 7520 of the Internal Revenue Code; or (2) to take the regular value of the rental and discount it for the life expectancy of the individual. *See Tab 9 to Appellant's Motion, p. 43.* The testimony was:

> Q: Okay. So just to summarize, there's two methods that were recommended to you from the folks up at FASB. The first was to use IRS schedule - - what - - what did you call - -
>
> A: 7520.
>
> Q: Okay. And the second was to consider the value of the rental - - the - - the save rental, discounted by the life of the individual?
>
> A: That is correct.
>
> Q: Okay. Now, did you do those valuations?
>
> A: I did - - I did do those two valuations.

*See Tab 9 to Appellant's Motion, p. 43-44.*

Mr. Shariatzadeh then went on to explain how he performed those calculations, again ***without objection***. In making the rental value calculation, he used a 13.2 year life expectancy for Ms. Willis and determined that the rental value of the life estates in both homes comes to $1,100,000. Mr. Shariatzadeh concluded that this was a fair,

---

[3] As explained AICAPA is an organization that also reviews and promulgates GAAP. In the hierarchy of GAAP, AICPA falls just below FASB. *See Tab 9, p. 30.*

reasonable, and accurate way to value Ms. Willis's life estates. *Id.*

The challenges presented in this Motion by Ms. Willis all relate to a failure to discount valuations due to lack of marketability. But, this argument only relates to the Section 7520 valuation of the assets. In making a valuation based on saved rental value, no discount for lack of marketability was required because this is not a transferable interest. After lengthy cross-examination regarding the application of a lack of marketability discount, Mr. Shariatzadeh testified:

> Q: (By Ms. Garrison): Sir, the - - everything we've just been talking about with IRS regulations has nothing to do with the other calculation that you made regarding savings of rental stream, correct?
>
> A: That's correct.

*See Tab 9, p. 65.*

In fact, counsel for Ms. Willis never even asked a question or challenged Mr. Shariatzadeh on this methodology for determining value. A discount for lack of marketability is only necessary for a fair market value analysis. There is nothing in Rule 24, law, or from FASB that requires only the use of fair market value in determining value. The rental value calculation is supported by GAAP, and there was no testimony to the contrary on this point. The trial court was well within

13

its discretion to rely on this evidence in making its determination of net worth.

## V. CONCLUSION

Ms. Willis has a positive net worth of approximately $200,000. It was her burden to prove net worth, and the trial court did not find Mr. Jayson's testimony to be credible. There is ample evidence to support the trial court's decision in this case, and the Order should be affirmed.

Ms. Willis attempts to appeal to the Court's sympathy by indicating that she had to borrow the money to post the bond.[4] But this begs the question, if she truly has no assets, what is she seeking to protect from execution?

Ms. Willis may, or may not, win her appeal. But if she wants to stay execution while the appeal is pending, she must post a bond in an amount sufficient to protect the judgment creditor. She should not be allowed to hide behind creative documentation, admittedly done for the purpose of putting assets outside the reach of her creditors. As Mr. Willis testified:

---

[4] As an interesting side note, Ms. Willis does not indicate where she got this loan. Surely, any arm's length lender would want security for such a loan, indicating that she has assets sufficient to secure the loan.

A:     Because I was - - I was extremely worried when I looked at Francie's assets or her liabilities.  I was extremely worried about the liabilities, and I didn't want to be a part of it.  So part of the agreement for reconciliation is that I took these assets.  That was part of the agreement.  That's why we did it.

*See Tab 8, p. 11.*  This is a classic transfer with an intent to hinder, delay or defraud a creditor (including BPMT).

The trial court saw through these attempts, as should this Court. The purpose behind this statute is to create a situation where a judgment debtor can supersede a judgment while on appeal that won't result in financial ruin.  But the purpose is not to allow a judgment debtor to avoid posting a bond through creative accounting and the transfer of assets.  The judgment debtor should be required to post the bond it can, even if that results in hardship, not merely the bond it wants.  In this case, Ms. Willis was absolutely able to post the bond required by the trial court, and thus this decision should not be altered.

Respectfully Submitted:

WEYCER, KAPLAN, PULASKI & ZUBER, P.C.

By:____/s/ Tanya N. Garrison_____
       TANYA N. GARRISON
       State Bar No. 24027180
       11 Greenway Plaza, Suite 1400
       Houston, Texas 77046-1104
       Telephone: (713) 961-9045
       Facsimile:  (713) 961-5341

       ATTORNEYS FOR APPELLEE
       BPMT, LLC

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading has been forwarded on Thursday, April 30, 2015 by certified mail-return receipt requested, to the following counsel of record for Appellants:

/s/ Tanya N. Garrison_____
Tanya N. Garrison